**BURSOR & FISHER, P.A.**
Joshua R. Wilner (State Bar No. 353949)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: jwilner@bursor.com

*Attorney for Plaintiff*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISHAL SHAH, individually and on behalf of all others similarly situated, | Case No.: 8:26-cv-364 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| EDWARD D. JONES & CO., L.P. d/b/a EDWARD JONES, | **JURY TRIAL DEMANDED** |
| Defendant. | |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Vishal Shah ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all persons who have accessed and used www.edwardjones.com (the "Website") to find a financial advisor.

2. Defendant offers financial advising services and matches customers with financial advisors through its Website. In order to be matched with a financial advisor through the Website, applicants must share confidential information, including their income, amount of investments, employment status, and protected characteristics like sexual orientation. When consumers provide this information on their applications, they expect that such confidential information and activity will be protected and not disclosed to unknown third parties. Such expectations are based, in part, on the legal protections afforded to such information.

3. Despite reasonable expectations of privacy, and Defendant's legal duties to prevent the disclosure of such private information, Defendant disclosed information provided by consumers on its financial advisor matching pages to LinkedIn Corporation ("LinkedIn"). These disclosures include communications that contain sensitive and confidential information – i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA"), Cal. Fin. Code § 4050, *et seq.* (the "California Financial Information Privacy Act" or "CalFIPA"), and Cal. Ins. Code § 791, et seq. (the California "Insurance Information and Privacy Protection Act" or "IIPPA").

4. Through the acts alleged herein, Defendant violated the Electronic Communications Privacy Act, 18 U.S.C. 2511, *et seq.* ("ECPA") and the California

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    1

Invasion of Privacy Act ("CIPA") §§ 631 and 632 by disclosing Plaintiff's and Class Members' private and confidential information without consent.

## THE PARTIES

5.     Plaintiff Vishal Shah is a citizen of California, residing in Buena Park, California. In or around October 2025, Plaintiff sought to be matched to a financial advisor on the Website. By answering the questions in the associated quiz, Plaintiff provided information related to his financial condition, private investments, employment status, and other elements of his private affairs.

6.     Plaintiff entered personal information into the Website using the same device and browser used to access his LinkedIn account.  When creating his LinkedIn account, Plaintiff provided certain information to LinkedIn, including his full name.

7.     Unbeknownst to Plaintiff, Defendant disclosed his personally identifiable information ("PII") to LinkedIn—including communications that contained Plaintiff's confidential, "nonpublic personal information" as defined by the GLBA, CalFIPA, and IIPPA.  Neither Defendant, nor LinkedIn, procured Plaintiff's prior consent to the sharing of his private and protected information.

8.     Defendant Edward D. Jones & Co., L.P. d/b/a Edward Jones is a limited partnership created under the laws of the State of Missouri.  Defendant develops, owns, and operates the Website, which is available throughout the United States.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from the defendant.

10. This Court has personal jurisdiction over the parties because Plaintiff resides in California, is a California citizen, and submits to the jurisdiction of the Court. Further, the Defendant has, at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and operation of its services to residents within this District and throughout California. Additionally, Plaintiff, while in California, sought to be matched with a financial advisor through Defendant's Website.

11. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because the Defendant transacts significant business within this District and the acts that gave rise to this cause of action occurred within this District.

## FACTUAL ALLEGATIONS

### I. THE CALIFORNIA INVASION OF PRIVACY ACT

12. The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

13. The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

14. Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been

recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*

As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added, internal citations omitted).

15. As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

16. CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

17. As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

18. A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    4

19.     Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).

## II.   THE GRAMM-LEACH-BLILEY ACT AND CALIFORNIA FINANCIAL INFORMATION PRIVACY ACT

20.     As Congress and the California Legislature recognized, "nonpublic personal information" is confidential.

21.     Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i)     Personally identifiable financial information; and

(ii)    Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

22.      Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i)     A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii)    About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii)   [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(A)    Information a consumer provides to [a financial institution]on an application to obtain a loan, credit card, or other financial product or service;

(B)    Account balance information, payment history, overdraft history, and credit or debit card purchase information;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                      5

    (C)    The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

    (D)    Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

    (E)    Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account; and

(F)    Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server).

23.    Pursuant to 16 C.F.R. § 313.3(k)(1):

a financial institution "means any institution the business of which is engaging in an activity that is financial in nature or incidental to such financial activities as described in section 4(k) of the Bank Holding Company Act of 1956, 12 U.S.C. 1843(k). An institution that is significantly engaged in financial activities, or significantly engaged in activities incidental to such financial activities, is a financial institution."

24.    Pursuant to 16 C.F.R. § 313.3(k)(1), Edward Jones is a financial institution.

25.    In passing CalFIPA, the California Legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions[]" and "inten[ded] . . . to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act[.]" Cal. Fin. Code § 4051(a)-(b).

26.    Cal. Fin. Code § 4052(a) provides that:

"Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED    6

transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution.

27.    According to Cal. Fin. Code § 4052(b):

"Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:

(1)    Information a consumer providers to a financial institution on an application to obtain a loan, credit card, or other financial product or service.

(2)    Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(3)    The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4)    Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5)    Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(6) Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

28. "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates." Cal. Fin. Code § 4052.5.

29. Thus, Plaintiff's and Class Members' "nonpublic personal information" is confidential, under both federal and California law. Nonetheless, such information was intercepted in transit by the LinkedIn Insight Tag as enabled by Defendant—and neither Defendant nor LinkedIn procured Plaintiff's and Class Members' consent prior to this interception.

30. This pattern of conduct by Defendant flouts the GLBA's and CalFIPA's respective purposes of enhancing "financial privacy[.]"[1]

## III. DEFENDANT DISCLOSES USERS' PRIVATE INFORMATION TO LINKEDIN

### A. LinkedIn's Platform and Business Tools

31. LinkedIn markets itself as "the world's largest professional network on the internet[.]"[2] But LinkedIn is no longer simply a tool to help users find jobs or expand their professional network. LinkedIn has moved into the marketing and advertising space, and boasts of its ability to allow potential advertisers to "[r]each 1 billion+ professionals around the world" via its Marketing Solutions services.[3] Recently, LinkedIn was projected as being responsible for "roughly 0.9 percent of the

---

[1] http://www.leginfo.ca.gov/pub/03-04/statute/ch_0201-0250/ch_241_st_2003_sb_1. *See also* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200320040SB1.

[2] LINKEDIN, WHAT IS LINKEDIN AND HOW CAN I USE IT?, https://www.linkedin.com/help/linkedin/answer/a548441#.

[3] LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    8

global ad revenue" which included approximately $5.91 billion in advertising revenue in 2022.[4]

32.    According to LinkedIn, "[t]argeting is a foundational element of running a successful advertising campaign — [g]etting your targeting right leads to higher engagement, and ultimately, higher conversion rates." [5]  Targeting refers to ensuring that advertisements are targeted to, and appear in front of, the target demographic for an advertisement.  To that end, LinkedIn's Marketing Solutions services allow potential advertisers to "[b]uild strategic campaigns" targeting specific users.[6]  LinkedIn's "marketing solutions allow advertisers to select specific characteristics to help them reach their ideal audience.  The ads [users] see on LinkedIn are then targeted to provide content relevant to [the users]."[7]

33.    As a result of its activities and operation of the LinkedIn Insight Tag, LinkedIn is able to make extremely personal inferences about individuals' demographics, intent, behavior, engagement, interests, buying decisions, and more.[8]

34.    The personal information and communications obtained by LinkedIn are used to fuel various services offered via LinkedIn's Marketing Solutions including Ad Targeting, Matched Audiences, Audience Expansion, and LinkedIn Audience Network.[9]

---

[4] Valentina Dencheva, *LinkedIn annual ad revenue 2017-2027*, STATISTA (Dec. 12, 2023), https://www.statista.com/statistics/275933/linkedins-advertising-revenue.

[5] LINKEDIN, REACH YOUR AUDIENCE: TARGETING ON LINKEDIN, p.3, https://business.linkedin.com/content/dam/me/business/en-us/marketing-solutions/resources/pdfs/linkedin-targeting-playbook-v3.pdf.

[6] LINKEDIN, *supra* note 33.

[7] LINKEDIN, LINKEDIN ADS AND MARKETING SOLUTIONS, https://www.linkedin.com/help/lms/answer/a421454.

[8] *See* LINKEDIN, MARKETING SOLUTIONS, https://business.linkedin.com/marketing-solutions/audience ("Target audiences through demographic marketing[,]" "Zero in on intent, behavior, engagement, interests, and more[,]" and "Reach the LinkedIn audience involved in the buying decision").

[9] *See id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    9

35.    Such information is extremely valuable to marketers and advertisers because the inferences derived from users' personal information and communications allow marketers and advertisers, including providers of financial products and services, to target potential customers.[10]

36.    For example, through the use of LinkedIn's Audience Network, marketers and advertisers are able to expand their reach and advertise on sites other than LinkedIn to "reach millions of professionals across multiple touchpoints."[11] According to Broc Munro of Microsoft, "[w]e gravitate towards social platforms like LinkedIn to achieve more targeted marketing engagement. However, we know that our audiences don't spend all their time on social media. LinkedIn Audience Network enables us to expand our reach to trusted sites while still respecting our audience targeting. This increases the impact of our advertising."[12]

37.    In July 2022, "LinkedIn Marketing Solutions surpassed $5 billion in annual revenue[.]"[13]  That figure is "expected to further grow to reach 10.35 billion U.S. dollars by 2027."[14]

38.    According to LinkedIn, the LinkedIn Insight Tag, also called the Insight Tag is "[a] simple code snippet added to [a] website [that] can help you optimize your

---

[10] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy ("We serve you tailored ads both on and off our Services. We offer you choices regarding personalized ads, but you cannot opt-out of seeing other ads."); LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting ("Target your ideal customer based on traits like their job title, company name or industry, and by professional or personal interests").

[11] LINKEDIN, ACCOUNT TARGETING, https://business.linkedin.com/marketing-solutions/ad-targeting.

[12] LINKEDIN, LINKEDIN AUDIENCE NETWORK, https://business.linkedin.com/marketing-solutions/native-advertising/linkedin-audience-network.

[13] *LinkedIn Business Highlights from Microsoft's FY22 Q4 Earnings*, LINKEDIN PRESSROOM (July 25, 2022), https://news.linkedin.com/2022/july/linkedin-business-highlights-from-microsoft-s-fy22-q4earnings#:~:text=And%20LinkedIn% 20Marketing%20Solutions%20surpassed,revenue%20for%20the%20first%20time.

[14] Dencheva, *supra* note 34.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    10

campaigns, retarget your website visitors, and learn more about your audiences."[15] LinkedIn represents that the LinkedIn Insight Tag "enable[s] in-depth campaign reporting and unlock[s] valuable insights about your website visitors."[16]

39. LinkedIn's current iteration of its Insight Tag is a JavaScript-based code which allows for the installation of its software.[17] A critical feature allows the LinkedIn Insight Tag to track users, even when third-party cookies are blocked.[18] LinkedIn "recommend[s] using the JavaScript-based Insight Tag or Conversions API" because third-party cookie settings are being deprecated across the industry.[19] Embedding the JavaScript as a first-party cookie causes users' browsers to treat the LinkedIn Insight Tag as though it is offered by the website being visited, rather than by LinkedIn. Doing so ensures that the third-party cookie-blocking functions of modern web browsers do not prevent LinkedIn from collecting data through its Pixel.[20] Instead, the LinkedIn Pixel is shielded with the same privacy exemptions offered to first-party cookies.

40. When a user who has signed in to LinkedIn (even if the user subsequently logs out) is browsing a website where the LinkedIn Insight Tag has been embedded, an HTTP request is sent using cookies, which includes information about the user's actions on the website.

41. These cookies also include data that differentiate users from one another and can be used to link the data collected to the user's LinkedIn profile.

---

[15] LINKEDIN, INSIGHT TAG, https://business.linkedin.com/marketing-solutions/insight-tag.

[16] LINKEDIN, LINKEDIN INSIGHT TAG FAQS, https://www.linkedin.com/help/lms/answer/a427660.

[17] LINKEDIN, *supra* note 45.

[18] *Id.* ("It's important for advertisers to prepare for these changes by switching to JavaScript tags and enabling 'enhanced conversion tracking' in the Insight Tag settings to continue capturing signals where 3rd party cookies are blocked.").

[19] *See id.*

[20] *See id.*

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED 11

42. The HTTP request about an individual who has previously signed into LinkedIn includes requests from the "li_sugr" and "lms_ads" cookies. Each of these cookies are used by LinkedIn "to identify LinkedIn Members off LinkedIn" for advertising purposes.[21]

43. For example, the "li_sugr" cookie is "[u]sed to make a probabilistic match of a user's identity."[22] Similarly, the "lms_ads" cookie is "[u]sed to identify LinkedIn Members off LinkedIn for advertising."[23]

44. A LinkedIn profile contains information including an individual's first and last name, place of work, contact information, and other personal details. Based on information it obtains through the LinkedIn Insight Tag, LinkedIn targets its account holders for advertising.

45. LinkedIn never receives consent from users to intercept and collect electronic communications containing their sensitive and unlawfully-disclosed information. In fact, LinkedIn expressly warrants the opposite.

46. When first signing up, a user agrees to the User Agreement.[24] By using or continuing to use LinkedIn's Services, users agree to two additional agreements: the Privacy Policy[25] and the Cookie Policy.[26] For California residents, LinkedIn also publishes a California Privacy Disclosure.[27]

47. LinkedIn's Privacy Policy begins by stating that "LinkedIn's mission is to connect the world's professionals . . . . Central to this mission is our commitment to

---

[21] LINKEDIN, LINKEDIN COOKIE TABLE, https://www.linkedin.com/legal/l/cookie-table.

[22] *See id.*

[23] *See id.*

[24] LINKEDIN, USER AGREEMENT, https://www.linkedin.com/legal/user-agreement.

[25] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.

[26] LINKEDIN, COOKIE POLICY, https://www.linkedin.com/legal/cookie-policy.

[27] LINKEDIN, CALIFORNIA PRIVACY DISCLOSURE, https://www.linkedin.com/legal/california-privacy-disclosure.

---

be transparent about the data we collect about you, how it is used and with whom it is shared."[28]

48. The Privacy Policy goes on to describe what data LinkedIn collects from various sources, including cookies and similar technologies.[29] LinkedIn states "we use cookies and similar technologies (e.g., pixels and ad tags) to collect data (e.g., device IDs) to recognize you and your device(s) on, off and across different services and devices where you have engaged with our Services. We also allow some others to use cookies as described in our Cookie Policy."[30]

49. However, LinkedIn offers an express representation: "**We will only collect and process personal data about you where we have lawful bases.**"[31]

50. Despite this explicit representation, Defendant unlawfully disclosed sensitive and protected information to LinkedIn in violation of state and federal privacy laws.

51. Users never choose to provide sensitive information to LinkedIn because, among other reasons, they never know whether a particular website uses the LinkedIn Insight Tag, and, if so, what sensitive personal data it collects or receives.

**B. How Defendant Disclosed Plaintiff's and Class Members' Protected Personally Identifiable Information and Financial Information Through The LinkedIn Insight Tag**

52. Edward Jones owns and operates the Website, where it encourages visitors to match with a financial advisor.

53. At all relevant times, Defendant's Website utilized the LinkedIn Insight Tag.

54. Through the LinkedIn Insight Tag, Defendant disclosed their applicants' identities and online activity, including information related to consumers' financial

---

[28] LINKEDIN, PRIVACY POLICY, https://www.linkedin.com/legal/privacy-policy.
[29] *Id.*
[30] *Id.*
[31] *Id.* (emphasis added).

condition and investments, with one of the world's largest technology companies for targeted advertising purposes.

55. When a user visits the website and asks to be matched with a financial advisor, they are prompted to "Take the Quiz" to be matched. When the user clicks the "Take the quiz" button, their response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.

```
"scriptVersion": 269,
"time": 1759179463707,
"domain": "match.edwardjones.com",
"url": "https://match.edwardjones.com/?ej_referrer=financial-advisor-locator",
"pageTitle": "Find Your Best Financial Advisor Matches | Edward Jones",
"websiteSignalRequestId": "453d9eb7-f663-28e1-c698-6a26d68a434a",
"isTranslated": false,
"liFatId": "",
"liGiant": "",
"misc": {
  "psbState": -4
},
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "/survey?ej_referrer=financial-advisor-locator",
"domAttributes": {
  "elementSemanticType": null,
  "elementValue": null,
  "elementType": null,
  "tagName": "A",
  "backgroundImageSrc": null,
  "imageSrc": null,
  "imageAlt": null,
  "innerText": "Take the quiz",
```

56.     The user is then prompted to answer a series of questions to be matched with a financial advisor. The user is first asked if they currently work with a financial advisor. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.



```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
  "elementSemanticType": null,
  "elementValue": null,
  "elementType": null,
  "tagName": "LABEL",
  "backgroundImageSrc": null,
  "imageSrc": null,
  "imageAlt": null,
  "innerText": "No",
```

57.    The user is next asked what they need from a financial advisor. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.



```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
  "elementSemanticType": null,
  "elementValue": null,
  "elementType": null,
  "tagName": "LABEL",
  "backgroundImageSrc": null,
  "imageSrc": null,
  "imageAlt": null,
  "innerText": "Planning for assets recently received",
  "elementTitle": null,
  "cursor": "pointer"
```

58.    The user is next asked how they feel about their current savings goals. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.



```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
  "elementSemanticType": null,
  "elementValue": null,
  "elementType": null,
  "tagName": "LABEL",
  "backgroundImageSrc": null,
  "imageSrc": null,
  "imageAlt": null,
  "innerText": "I feel like I\u2019m behind on my goals and want to catch up",
  "elementTitle": null,
  "cursor": "pointer"
}
```

59.    The user is next asked about their amount of investment experience. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.



```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
  "elementSemanticType": null,
  "elementValue": null,
  "elementType": null,
  "tagName": "LABEL",
  "backgroundImageSrc": null,
  "imageSrc": null,
  "imageAlt": null,
  "innerText": "Just getting started",
  "elementTitle": null,
  "cursor": "pointer"
```

60.     The user is next asked how they would describe their finances. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.

```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
   "elementSemanticType": null,
   "elementValue": null,
   "elementType": null,
   "tagName": "LABEL",
   "backgroundImageSrc": null,
   "imageSrc": null,
   "imageAlt": null,
   "innerText": "Complex",
   "elementTitle": null,
   "cursor": "pointer"
```

61.     The user is next asked their age. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.



62.    The user is next asked when they plan to retire. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.



```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
  "elementSemanticType": null,
  "elementValue": null,
  "elementType": null,
  "tagName": "LABEL",
  "backgroundImageSrc": null,
  "imageSrc": null,
  "imageAlt": null,
  "innerText": "Retirement is just around the corner for me",
  "elementTitle": null,
  "cursor": "pointer"
```

63.  The user is next asked how much money they are considering investing. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.

```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
  "elementSemanticType": null,
  "elementValue": null,
  "elementType": null,
  "tagName": "LABEL",
  "backgroundImageSrc": null,
  "imageSrc": null,
  "imageAlt": null,
  "innerText": "$250,000 - $499,999",
  "elementTitle": null,
  "cursor": "pointer"
```

64. The user is next asked how they generate income. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.



```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
    "elementSemanticType": null,
    "elementValue": null,
    "elementType": null,
    "tagName": "LABEL",
    "backgroundImageSrc": null,
    "imageSrc": null,
    "imageAlt": null,
    "innerText": "Full-time employment",
    "elementTitle": null,
    "cursor": "pointer"
```

65.    The user is next asked the amount of their household income. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.



```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
  "elementSemanticType": null,
  "elementValue": null,
  "elementType": null,
  "tagName": "LABEL",
  "backgroundImageSrc": null,
  "imageSrc": null,
  "imageAlt": null,
  "innerText": "$140,000 - $199,999",
  "elementTitle": null,
  "cursor": "pointer"
```

66. Next, the user is asked who they invested money is for. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.



```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
    "elementSemanticType": null,
    "elementValue": null,
    "elementType": null,
    "tagName": "LABEL",
    "backgroundImageSrc": null,
    "imageSrc": null,
    "imageAlt": null,
    "innerText": "Myself",
    "elementTitle": null,
    "cursor": "pointer"
```

67. Finally, the user is asked for special considerations when being matched. Possible answers to this question include protected characteristics like LGBTQ+ identification and veteran status. The user's response is contemporaneously sent to LinkedIn through the LinkedIn Insight Tag.

**Would you like any of the following to be considered when being matched?**

☐ Charitable intent

☐ Frequent salary fluctuations in your line of work

☐ LGBTQ+ financial considerations

☐ Military or veteran

☑ Sustainable investing

☐ None of these apply

See My Matches

```
"isLinkedInApp": false,
"hem": null,
"signalType": "CLICK",
"href": "",
"domAttributes": {
  "elementSemanticType": null,
  "elementValue": null,
  "elementType": null,
  "tagName": "LABEL",
  "backgroundImageSrc": null,
  "imageSrc": null,
  "imageAlt": null,
  "innerText": "Sustainable investing",
  "elementTitle": null,
  "cursor": "pointer"
```

68. The information disclosed by Defendant allows LinkedIn to know the identities of specific individuals as well as their private financial information. This allows these companies, including Defendant, to profit from this information for targeted advertising purposes.

69. When users share their personal information to be matched with a financial advisor, they expect this information to be kept confidential. Moreover, when consumers seek a specific service from financial websites, they also expect the highly sensitive information they provide on their applications to be kept confidential.

70. Through the above-listed LinkedIn tracking services, which Defendant used via the software code installed, integrated and embedded into the Website, Edward Jones disclosed its customers' legally protected information.

71. Defendant engages in this deceptive conduct for its own profit at the expense of its customers' privacy. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

## CLASS ALLEGATIONS

72. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Classes:

**Nationwide Class:** All natural persons in the United States who, during the class period, maintained a LinkedIn account and entered information into the Website.

**California Subclass:** All natural persons in the State of California who, during the class period, maintained a LinkedIn account and entered information into the Website.

73. Plaintiff reserves the right to modify the Class definitions, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

74. The following people are excluded from the Classes: (1) any Judge presiding over this action and members of their family; (2) Defendant, Defendant's

subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

75. **Numerosity:** The number of persons within the Classes is substantial and believed to amount to thousands of persons. It is, therefore, impractical to join each member of the Classes as a named plaintiff. Further, the size and relatively modest value of the claims of the individual members of the Classes render joinder impractical. Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation. Moreover, the Classes are ascertainable and identifiable from Defendant's and LinkedIn's records.

76. **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Classes and that predominate over any questions affecting only individual members of the Classes. These common legal and factual questions, which do not vary between members of the Classes, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated the ECPA, the CIPA §§ 631 and 632, and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

77. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the named Plaintiff, like all other class members, visited the Website and had his confidential electronic communications intercepted and disclosed to LinkedIn through LinkedIn's Insight Tag.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    28

78. **Adequate Representation:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of members of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

79. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Classes may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

<strong><u>CAUSE OF ACTION</u></strong>

<strong><u>COUNT I</u></strong><br/>
<strong>Violation of the Electronic Communications Privacy Act,<br/>
18 U.S.C. § 2511, <em>et seq.</em></strong>

80. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

81. Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

82. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

83. The ECPA protects both sending and the receipt of communications.

84. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

85. The transmission of Plaintiff's PII and financial information to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

86. The transmission of PII and financial information between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

87. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication."  18 U.S.C. 18 U.S.C. § 2510(8).

88. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device."  18 U.S.C. § 2510(4).

89. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

90. The following instruments constitute "devices" within the meaning of the ECPA:

   a. The computer codes and programs Defendant and LinkedIn used to track Plaintiff and Class Members communications while they were navigating the Website;

   b. Plaintiff's and Class Members' browsers;

c.    Plaintiff's and Class Members' mobile devices;

d.    Defendant's and LinkedIn's web and ad servers;

e.    The plan the Defendant and LinkedIn carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

91.    Plaintiff and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

92.    By utilizing and embedding the tracking technology provided by LinkedIn on its website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

93.    Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technology provided by LinkedIn on the Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and financial information to LinkedIn.

94.    Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII, including their identities and information related to the specific financial product they were applying for, as well as information related to their home address and housing status.  This confidential information is then monetized for targeted advertising purposes, among other things.

95.    By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to LinkedIn through the LinkedIn Insight Tag, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

96. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

97. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, the GLBA, CalFIPA, and invasion of privacy, among others.

98. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Gramm-Leach-Bliley Act, 16 C.F.R. § 313. This provision imposes a criminal penalty for knowingly disclosing "nonpublic personal information" to a third party. GLBA defines nonpublic personal information as:

> Any information that is not publicly available and that: a consumer provides a financial institution to obtain a financial product or service from the institution; results from a transaction between the consumer and the institution involving a financial product or service; or a financial institution otherwise obtains about a consumer in connection with providing a financial product or service.[32]

99. Plaintiff's information that Defendant disclosed to LinkedIn qualifies as nonpublic personal information (including information related to their home address and housing status), and Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct constitutes tortious and/or criminal conduct through a violation of 16 C.F.R. § 313. Defendant specifically used the tracking

---

[32] 16 C.F.R. § 313

technology provided by LinkedIn to track and utilize Plaintiff's and Class Members' PII for financial gain.

100. Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

101. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members, all of whom are users of the Website, had a reasonable expectation that Defendant would not redirect their communications to LinkedIn without their knowledge or consent.

102. The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

103. As a result of each and every violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2511, *et seq*. under 18 U.S.C. § 2520.

## COUNT II
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 631(a)

104. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

105. Plaintiff brings this claim against Defendant individually and on behalf of the members of the California Subclass.

106. CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including

the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section

107.   CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email.  *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

108.   The LinkedIn Insight Tag is  a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

109.   LinkedIn is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, LinkedIn has the capability to use and does use the wiretapped

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    34

information for their own purposes.  Accordingly, LinkedIn is a third party to any communication between Plaintiff and California Subclass Members, on the one hand, and Defendant, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

110.  At all relevant times, LinkedIn willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and members of the California Subclass, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

111.  At all relevant times, LinkedIn used or attempted to use the communications intercepted to, *inter alia*, monitor and improve their products and services.

112.  At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled LinkedIn to wiretap Plaintiff and members of the California Subclass through the LinkedIn Insight Tag and to accomplish the wrongful conduct at issue here.

113.  Plaintiff and members of the California Subclass did not provide their prior consent LinkedIn's intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and California Subclass members' electronic communications.  Nor did Plaintiff and California Subclass members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling LinkedIn's conduct.

114.  The wiretapping of Plaintiff and California Subclass members occurred in California, where Plaintiff and California Subclass members accessed the Website and where the LinkedIn Insight Tag—as enabled by Defendant—routed Plaintiff's and California Subclass members' electronic communications to their servers.

115.   Pursuant to Cal. Penal Code § 637.2, Plaintiff and California Subclass members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT III
### Violation Of The California Invasion Of Privacy Act, Cal. Penal Code § 632

116.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

117.   Plaintiff brings this claim against Defendant individually and on behalf of the members of the California Subclass.

118.   Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

119.   Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

120.   Plaintiff's and Class members' communications to Defendant, including their sensitive personal and financial information, were confidential communications for purposes of § 632, because Plaintiff and Class Members had an objectively reasonable expectation of privacy in this data.

121.   Plaintiff and Class Members expected their communications to be confined to Defendant in part, due to the protected nature of the information at issue. Plaintiff and Class Members did not expect LinkedIn secretly eavesdrop upon or record this confidential information and their communications.

122.   LinkedIn's tracking technology, i.e., the LinkedIn Insight Tag, are all electronic amplifying or recording devices for purposes of § 632.

123.   By contemporaneously intercepting and recording Plaintiff's and Class Members' confidential communications to Defendant through this technology,

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                      36

LinkedIn eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

124. At no time did Plaintiff or Class Members consent to LinkedIn's conduct, nor could they reasonably expect that their communications would be overheard or recorded by LinkedIn.

125. LinkedIn utilized Plaintiff's and Class Members' sensitive personal and financial information for its own purposes, including for targeted advertising.

126. Plaintiff and Class Members seek statutory damages in accordance with § 637.2(a) which provides for the greater of: (1) $5,000 per violation; or (2) three times the amount of damages sustained by Plaintiff and the Classes in an amount to be proven at trial, as well as injunctive or other equitable relief.

127. Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts. Plaintiff's and Class Members' sensitive data has been collected, viewed, accessed, stored, by LinkedIn, have not been destroyed, and due to the continuing threat of such injury, have no adequate remedy at law. Plaintiff and Class Members are accordingly entitled to injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e)     For punitive damages, as warranted, in an amount to be determined at trial;

(f)     For prejudgment interest on all amounts awarded;

(g)     For injunctive relief as pleaded or as the Court may deem proper; and

(h)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiff demands a trial by jury of all issues so triable.

Dated:  February 18, 2026                    Respectfully submitted,

                                             **BURSOR & FISHER, P.A.**

                                             By: */s/ Joshua R. Wilner*
                                                  Joshua R. Wilner

                                             Joshua R. Wilner (State Bar No. 353949)
                                             1990 North California Blvd., 9th Floor
                                             Walnut Creek, CA 94596
                                             Telephone: (925) 300-4455
                                             Facsimile:  (925) 407-2700
                                             E-mail: jwilner@bursor.com

                                             *Attorney for Plaintiff*